Filed 12/22/14  P. v. John CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES DAVID JOHN,<br><br>    Defendant and Appellant. | B250803<br><br>(Los Angeles County<br>Super. Ct. No. BA395535) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rand S. Rubin, Judge.  Affirmed.

Lise M. Breakey, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted James David John of first degree burglary. (Pen. Code, § 459.) He was sentenced to a term of 40 years to life. He contends that the trial court erred by authorizing the use of a rape conviction for impeachment, which dissuaded him from testifying at trial. John cannot raise the impeachment issue on appeal because he did not testify. In any event, the evidence of John's guilt is overwhelming, and there is no reasonable probability his testimony would have secured a favorable outcome.

## FACTS

Zal Batmanglij was using his home computer at 1:00 a.m. on March 23, 2012. He heard footsteps above him, on the second floor of the house where he lives alone. Batmanglij quietly left the house and ran to a neighbor, Ofer Moses, telling Moses that he thought there was an intruder.

The two men walked to a point where they had a clear view of Batmanglij's house. They saw a man's face appear in the upstairs sliding glass door. Batmanglij described the face as "very pale" and "ominous" looking. Frightened, he called 911 to summon help. During the 911 call, Batmanglij watched his house and did not see anyone leave it.

At trial, Moses identified the face he saw in the window as defendant John. Moses testified that defendant stood at the window for 20 to 30 seconds, and what he saw was "unmistakable." Moses witnessed several LAPD officers approaching Batmanglij's house on foot. Moses saw defendant leave the house as the police arrived.

Police Officer Jonathan Pacheco and a partner shined their flashlights on a Caucasian male carrying two paper bags, just outside a door to the victim's house. Pacheco identified the man as defendant. When ordered to stop, defendant looked in the direction of the police and immediately ran through a gate, toward the rear of the property, dropping the bags as the officers chased him. Pacheco lost sight of defendant but could hear him climbing over fences. More officers arrived. Pacheco found defendant hiding under a pile of leaves and bushes in a nearby yard. It was the same person that Pacheco had just seen at the victim's house.

The police showed defendant to the eyewitnesses. Moses confidently identified defendant as the person whose face he saw at the window. Batmanglij was unable to

2

identify defendant. Batmanglij testified that police showed him an "older dude resembling Nick Nolte," whereas he told an investigator that the person he saw in the window of his house had "a young face."

The intruder entered by opening a kitchen window and prying back the screen. After police took defendant into custody, Batmanglij entered his home and saw that his kitchen cabinets were open, though he had left them closed. Outside of the house, Batmanglij saw a shopping bag on the ground near the kitchen widow, with his personal belongings scattered around it—three video cameras, an Apple laptop computer, a bottle of olive oil, a bottle of liquor from his bar, and a humidor for cigars.

Defendant's investigator examined Batmanglij's home and its surroundings, and testified that the nearest streetlights are 150 and 171 feet away. Also, Batmanglij's home has tinted windows. Defendant did not testify.

## PROCEDURAL HISTORY

Defendant was charged with first degree burglary of an inhabited dwelling, with a person present, a serious felony. The information alleged that defendant has felony convictions.[1] He was found competent to stand trial. Defendant's first trial ended in deadlock (11 to 1 in favor of conviction); mistrial was declared on March 19, 2013.

A second trial began in May 2013. For several days, defendant refused to attend court proceedings. When he finally did attend court, he was disruptive. The jury found defendant guilty of first degree burglary. Defendant admitted the prior convictions. He was sentenced to a total of 40 years to life. He appeals the judgment.

## DISCUSSION

The only issue is whether the trial court abused its discretion by authorizing the use of a 1987 rape conviction for impeachment. During defendant's first trial, the court ruled that three 1987 burglary convictions could be used to impeach defendant, plus the

---

[1]     The prior convictions are burglary (April 1984); two counts of burglary (June 1984); grand theft, rape, and three counts of burglary (May 1987); and making criminal threats (February 2002). Defendant stipulated to the "strike" priors.

3

2002 conviction for making criminal threats, but it excluded defendant's 1987 rape conviction as being "highly prejudicial." Defendant testified and blamed a fellow transient for entering Batmanglij's home. Defendant claimed that he neither went inside nor acted as a lookout, but stayed outside the house, smoking methamphetamine.

At the outset of defendant's second trial, the trial court ruled that the rape and the criminal threat convictions could be used to impeach defendant because they both "go to dishonesty or readiness to do evil. I think they're relevant." The court excluded the three 1984 burglary convictions and sanitized the 1987 burglary convictions as felonies of moral turpitude. Defense counsel objected that the word "rape" has an "understandable, prejudicial impact" that would affect defendant's willingness to testify, even if the court used a limiting instruction.

Defendant renewed his objection at the close of the prosecution's case, stating that the three 1987 burglaries and the criminal threat conviction are ample impeachment, but the 1987 rape is "a little bit over the top." The court replied, "[T]here are another three burglaries that I am not allowing in. The whole idea behind using priors to impeach is either dishonesty, theft, or perjury-type offense, or readiness to do evil. Sometimes the most heinous crimes are also the most telling regarding honesty and factors to consider regarding impeachment." The court noted that although there is a gap between defendant's crimes, he spent a considerable portion of that time behind bars.

When defense counsel called defendant to the stand, defendant objected. He stated that the court was being "prejudicial on my prior . . . the sexual assault case, 1987." When the court declined to change its ruling, defendant announced, "[Y]ou violated my constitutional right to a fair trial. For the record, I'm not testifying."

"It is well established that the denial of a motion to exclude impeachment evidence is not reviewable on appeal if the defendant subsequently declines to testify." (*People v. Ledesma* (2006) 39 Cal.4th 641, 731.) This rule, derived from *Luce v. United States* (1984) 469 U.S. 38, 43, has three bases. First, a reviewing court cannot rule on evidentiary questions without the factual context provided by the defendant's precise testimony. Second, any possible harm from an in limine ruling is wholly speculative,

4

because the trial court could make a different ruling as the evidence unfolds, and the prosecution might not use the prior conviction to impeach the defendant. Third, a reviewing court cannot weigh the prejudicial effect of the error if the defendant did not testify and was not impeached or cross-examined: requiring the defendant to testify permits a determination whether any erroneous impeachment was harmless error, and discourages defendants from planting a claim of reversible error in the event of a conviction. (*People v. Collins* (1986) 42 Cal.3d 378, 384-385.)

The rationale stated in *Luce* and *Collins* applies here. Although the record includes defendant's testimony from his first trial, he may have testified differently in his second trial; or the prosecution may not have used the rape conviction to impeach; or the error may have been harmless, when weighing the prosecution's evidence against defendant's testimony. Defendant is asserting "the right *to testify without being impeached by prior felony convictions. . . .* [¶] No witness, however, has the *right* to give testimony immune from such challenge," and the use of felony convictions to impeach does not infringe the right to testify. (*People v. Collins*, *supra*, 42 Cal.3d at p. 387; *Ohler v. United States* (2000) 529 U.S. 753, 759-760.) Defendant did not preserve a challenge to the court's ruling on impeachment because he did not "take the witness stand and actually suffer such impeachment." (*People v. Sims* (1993) 5 Cal.4th 405, 454.)

Even if the argument could be considered on appeal, there would still be no grounds for reversal. The trial courts "have broad discretion to admit or exclude prior convictions for impeachment purposes." (*People v. Collins*, *supra*, 42 Cal.3d at p. 389.) A felony used for impeachment is relevant if it shows moral turpitude, to cast doubt on witness veracity. (*People v. Castro* (1985) 38 Cal.3d 301, 314-317.) "[R]ape is a crime involving moral turpitude." (*People v. Mazza* (1985) 175 Cal.App.3d 836, 844.) Thus, the court had discretion to admit defendant's rape conviction. Sanitizing the conviction to refer to it merely as a "felony" rather than a "rape" would defeat the purpose of casting doubt on defendant's veracity. Although the rape conviction was 26 years old, defendant spent the better part of his life in prison for his numerous convictions, and has persistently engaged in criminality.

5

Improperly admitting impeachment evidence is not reversible error unless its exclusion is likely to have given defendant a more favorable outcome. (*People v. Castro*, *supra*, 38 Cal.3d at pp. 318-319.) The evidence of defendant's guilt is overwhelming. Eyewitness Ofer Moses positively identified defendant, first at the window of the victim's home, then in a field showup, and then at trial. He was certain that defendant was the person he saw in Batmanglij's house, and no one left the premises until Moses saw defendant run away as police approached. Officer Pacheco's flashlight revealed defendant outside of the victim's house, carrying paper bags. Defendant immediately fled when the police ordered him to stop. He was found hiding under leaves and bushes in a nearby yard.

The direct evidence would have been bolstered if defendant had testified and been impeached by his prior burglary convictions, even without the rape conviction. If he testified, the prosecutor planned to confront him with spontaneous statements he made to arresting officers that "In my younger days I jumped a lot of fences, I outran a lot of cops." There is no reasonable probability that defendant would have achieved a more favorable outcome by testifying. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

6